**OUTTEN & GOLDEN LLP**
**Allegra L. Fishel (AF 4866)**
**Carmelyn P. Malalis (CM 3350)**
*Attorneys for Plaintiff*
**3 Park Avenue, 29th Floor**
**New York, New York 10016**
**(212) 245-1000**
**Fax: (212) 245-8930**
**e-mail: afishel@outtengolden.com**
**e-mail: cpm@outtengolden.com**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

WILLIAM A. BRIGHAM,

      Plaintiff,

          – against –

THE U.S. TRUST CO. OF NEW YORK
and CHARLES SCHWAB & CO.,

      Defendants.

-------------------------------------------------------------------x

**COMPLAINT**

**TRIAL BY JURY**

## I. INTRODUCTION

1.      Plaintiff, by his attorneys, OUTTEN & GOLDEN LLP, brings this action against

Defendants, The U.S. Trust Co. of New York and Charles Schwab & Co. to remedy

intentional discrimination against him because of his age, in violation of the Age

Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.* ("ADEA"), and the New York

City Human Rights Law, New York City Administrative Code § 8-101 *et seq.* ("City

Human Rights Law").

2.      Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages and other appropriate legal and equitable relief pursuant to ADEA § 626(b) and the City Human Rights Law § 8-502.

## II. JURISDICTION AND VENUE

3.      Plaintiff, William A. Brigham ("Brigham" or "Plaintiff"), lives in New York City in the State of New York. He timely filed a charge of discrimination against Defendants, The U.S. Trust Co. of New York ("U.S. Trust") and Charles Schwab and Co. ("Schwab"), with the United States Equal Employment Opportunity Commission ("EEOC") by mailing the charge to the New York District Office on October 28, 2004.

4.      On March 25, 2005, the EEOC issued Plaintiff a notice informing him of his right to sue Defendants in federal court. Plaintiff has commenced this action within 90 days of receipt of the notice and has complied fully with all prerequisites for jurisdiction in this Court under the ADEA.

5.      Contemporaneously with the filing of this complaint, Plaintiff has mailed a copy of same, along with a letter of explanation, to the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirement under § 8-502(c) of the City Human Rights Law.

6.      Jurisdiction of the Court is proper under ADEA § 626(c). The Court has supplemental jurisdiction over Plaintiff's City Human Rights Law claims pursuant to 28 U.S.C. § 1367.

7.      As the unlawful employment practices complained of herein occurred within the Southern District of New York, venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

2

## III. PARTIES

8.     Brigham is a sixty-one-year-old man. His birth date is December 9, 1943. He was employed by Defendant, U.S. Trust, for more than thirty-one years (from 1972 until 2004). From 2000 through 2004, he was also an employee of Schwab. Brigham was wrongfully terminated from his employment on the basis of his age on June 24, 2004 when he was sixty years old.

9.     Defendant U.S. Trust is the nation's oldest trust company and is based in New York City with offices at 114 West 47th Street, New York, New York 10036-1532. U.S Trust is an employer within the meaning of the ADEA and the City Human Rights Law.

10.     Defendant Schwab is a brokerage firm which acquired U.S. Trust in 2000. Its corporate headquarters are located at 101 Montgomery Street, San Francisco, California 94104. Throughout Brigham's employment with Schwab, he worked out of U.S. Trust's offices in New York City. Schwab is an employer within the meaning of the ADEA and the City Human Rights Law.

## IV. FACTS

### A.     Plaintiff's Performance History With U.S. Trust

11.     Brigham was hired by U.S. Trust in 1972 as an assistant to portfolio managers in the company's Asset Management Division. He was twenty-nine years old and had received a Master's degree in Business Administration (M.B.A.) from The Wharton School in 1967.

12.     Throughout Brigham's employment with Defendants, the primary function of the Asset Management Division was the management of financial portfolios for clients, generally with investments worth more than one million dollars. Today, U.S. Trust

3

manages more than sixty billion dollars for some of the wealthiest families in the country.

13.     Throughout the course of his employment with U.S. Trust, Brigham was a devoted employee. He frequently worked six days per week. Brigham's clients included multiple branches of large, wealthy families throughout the United States. Over a period of three decades of employment with U.S. Trust, Brigham was the trusted financial advisor to several generations of these families.

14.     During his employment with U.S. Trust, Brigham was promoted five times.

15.     Brigham's last promotion was to the position of Managing Director in 1998. Along with this promotion, Brigham became a participant in U.S. Trust's Executive Incentive Plan ("EIP"). The EIP provided additional compensation which was tied to corporate objectives and individual performance.

16.     According to U.S. Trust's policy, the EIP (after 2003, the Long Term Incentive Plan ("LTIP")) was designed to "attract and retain a select group of individuals." Selection and participation in the EIP/LTIP was based on a determination that the individual employee was critical to the long-term success of the business, had a history of outstanding accomplishments, had earned the respect of both peers and clients, and had provided professional leadership.

17.     In 1998, as a condition of Brigham's participation in the EIP, U.S. Trust required Plaintiff to sign a non-solicitation agreement. That agreement restricted Brigham from soliciting clients of U.S. Trust for a period of one year upon his separation from the company for any reason.

4

18.     Throughout his tenure with U.S. Trust, Brigham received favorable written performance reviews. He was awarded annual bonuses, merit raises, stock options and shares of restricted stock. He was told that the grant of these awards was based on his successful achievement of the goals which had been set for him by U.S. Trust.

19.     In his last two annual written evaluations (for the years 2002 and 2003), Brigham's overall performance was rated, respectively, "Highly Valued" and "Distinguished."

**B.     Discrimination on the Basis of Age**

**Age-Related Comments Made to Brigham**

20.     In 2000, Schwab acquired U.S. Trust. At all times thereafter, Brigham was an employee of both U.S. Trust and Schwab.

21.     After U.S. Trust was acquired, Schwab replaced most of its senior management. Many of those brought in as replacements had little, if any, "wealth management" experience.

22.     Debra Feeks ("Feeks") is a Client Relationship Officer ("CRO") and a member of the "Leadership Team" in Division E of U.S. Trust's New York Wealth Management Group (prior to 1999, known as the Asset Management Division), the division in which Brigham worked. In this capacity, Feeks oversees and coordinates a group of Portfolio Managers, CROs, and Client Relationship Associates, including Brigham.

23.     Upon information and belief, Feeks was in her early forties at the time relevant to the events in this complaint, did not have an M.B.A. degree and had no training in investments. In addition to having received his M.B.A., Brigham is a Chartered Financial Analyst (C.F.A.).

24.     Beginning in about 2001 (after Schwab had acquired U.S. Trust), Feeks began regularly suggesting to Brigham that he introduce younger Portfolio Managers to his clients.

25.     On several occasions when she made this suggestion, she added, "God forbid you aren't here." This was Feek's justification for requesting Brigham to make these introductions. At that time, Brigham had no plans to leave or retire from the company.

26.     Introducing a second Portfolio Manager to a client was an unusual practice at U. S. Trust. Standard practice was that each client and related accounts was assigned a single Portfolio Manager.

27.     On numerous occasions, when Feeks worked with Brigham, her manner was disrespectful and even hostile toward him.

28.     Feeks criticized Brigham for what she perceived as his unwillingness to promote U.S. Trust's new investment products. She made her feelings known to Brigham's immediate supervisor, Glenn Switzer ("Switzer"), and the Manager of the New York Wealth Management Group, Chip Wilson ("Wilson").

29.     In fact, Brigham had a long history of using many of U.S. Trust's proprietary investment products in his accounts. He did not, however, recommend them in instances where he felt they were inappropriate. This frequently led to confrontations with Feeks, who regularly sent e-mails to Switzer, Wilson and sometimes others, complaining about Brigham's reluctance.

30.     In the fall of 2002, U.S. Trust offered a "Special Severance Benefits Plan" to certain employees, which included the option to take early retirement and receive up to a year's base salary in severance pay.

6

31.     Brigham, who was fifty-eight years old at the time, enjoyed the investment business and working with his clients and had no thoughts of retiring. He was, therefore, surprised when Paul Napoli, Executive Vice President of U.S. Trust, asked him if he was going to "take the package." Brigham said he was not.

### Prospective Maclellan Clients

32.     Between 1993 and 2004, Brigham managed the accounts of the Maclellan family, based in Chattanooga, Tennessee. The Maclellans' combined accounts comprise one of the largest client relationships at U.S. Trust. The Maclellans were pleased with Brigham's results.

33.     In April or May 2003, the Maclellans referred some of their relatives to U.S. Trust. The relatives were a branch of the family which U.S. Trust previously had little or no contact with and for which it managed no assets.

34.     Brigham assumed he would be making the new business presentation to the referrals since he had been the Maclellans' Portfolio Manager for over a decade and had helped secure the family's satisfaction with U.S. Trust. He was, therefore, the most qualified investment person to make the presentation.

35.     To Brigham's surprise, Feeks told him that he would not be making the presentation because she wanted a "younger" Portfolio Manager to present in his place.

36.     Despite the fact that Brigham had regularly made presentations to new business prospects, Feeks consulted with Switzer and arranged for Michael Taggart ("Taggart") to make the presentation.

37.    Upon information and belief, Taggart was in his early thirties at the time.

38.    Feeks and Switzer scheduled a meeting with Taggart, Brigham, Marcia Wilson
(a Business Development Officer) and John Sartorius (the senior CRO for Division E) to
discuss the upcoming presentation to the Maclellan referrals.

39.    At the meeting, Feeks, Switzer and Marcia Wilson focused the discussion on
the need for U.S. Trust to appear "young," "fresh" and "creative" when marketing to the
Maclellans.   They strongly believed that Taggart should make the presentation because
he was close to the same age as the prospects.

40.    No one at the meeting discussed Brigham's relative seniority and years of
experience versus Taggart's (at the time, Taggart – more than twenty years younger
than Brigham – had been employed by U.S. Trust for about three years) or that Brigham
had a longstanding relationship with the Maclellan family which had grown increasingly
lucrative for U.S. Trust over the prior decade.

41.    The day after the meeting, Brigham learned that Taggart would not be making
the new business presentation.

42.    Upon information and belief, Taggart knew how poorly many of U.S. Trust's
proprietary investment products had performed and was reluctant to recommend them.

43.    Brigham again offered to make the presentation.  Again, Feeks turned him
down.

44.    Shortly thereafter, Brigham learned that David Glennon ("Glennon") had been
chosen to make the presentation.

8

45.     Upon information and belief, in the spring of 2003, Glennon was in his early forties. At that time, he had been employed by U.S. Trust for approximately four months.

46.     Upon information and belief, at the time Glennon was chosen, he had never spoken to, corresponded with, or had any contact with any members of the Maclellan family.

47.     Upon information and belief, Glennon was chosen instead of Brigham to make the presentation, in significant part, because he was younger than Brigham.

48.     Feeks told Brigham that he could attend the meeting to "lend continuity" to the Maclellan family relationship, but that Glennon was to handle the substantive aspects of the presentation.

49.     Brigham accompanied Feeks, Glennon, Marcia Wilson and others to Chattanooga and sat in the meeting room, mostly silent, while the presentation was made.

50.     Brigham was embarrassed and humiliated to have to sit quietly by while Glennon, his junior both in the business and at U.S. Trust, addressed the relatives of a family he had successfully served for a decade.

51.     By the end of 2003, the prospective Maclellan clients (hereinafter "new Maclellan clients") did, in fact, become clients of U.S. Trust.  Their accounts were assigned to Glennon.

52.     The next scheduled meeting in Chattanooga with both old and new Maclellan clients was in May 2004.

9

53.     Several days before they left for Chattanooga, Feeks told Brigham that Glennon would be attending all of the meetings (except one) with the Maclellan clients that he managed. Brigham, however, was not invited to attend any meetings to be conducted by Glennon with the new Maclellan clients.

54.     The day before their departure, Feeks approached Brigham as he was creating a presentation to the board of trustees of one of the Maclellan foundations. Feeks demanded that Brigham provide copies of the presentation for herself and Glennon.

55.     Upon reviewing the presentation, Feeks became angry and went into Chip Wilson's office.

56.     Later, Chip Wilson ("Wilson") met with Brigham and asked him what investments he planned to recommend to the Maclellan trustees. Brigham told him.

57.     Wilson asked Brigham why he was not going to recommend "the hedge fund of funds," a proprietary investment product that U.S. Trust was then sponsoring.

58.     Brigham explained that he thought it was inappropriate to recommend it to the Maclellan trustees at that time. The trustees had approved the use of many of U.S. Trust's proprietary investment products in the past and, without exception, they had performed poorly. Brigham said he felt it might appear to be taking advantage of the Maclellans' goodwill toward U.S. Trust and that he would rather wait a while, possibly until the following year.

59.     Wilson stood up, closed the door to his office and criticized Brigham's reasoning, presentation and attitude.

## C.     Termination

60.     On June 24, 2004, Wilson called Brigham into a meeting.  There he was told that his position had "been eliminated," based on business needs.  No further explanation was given.

61.     Brigham's last day of work was August 6, 2004.

62.     After he had been informed of his termination, but before his departure, Brigham met with Paul Napoli ("Napoli"), Executive Vice President of U. S. Trust.  Brigham had known Napoli for more than twenty years and went to see him to try and find out more about why he was being terminated after thirty-one years.

63.     Napoli told Brigham that there had been a "ranking" conducted of Portfolio Managers in the Wealth Management Group, and that he had come in last.  He did not provide further information.

### Pretext of Termination

64.     After Brigham's departure, he learned more about the "ranking" Napoli had referred to.  The ranking was allegedly conducted in or around March 2004.  It supposedly evaluated and assigned a score to each Portfolio Manager in four areas of achievement.  These scores were then weighted and a total score derived.  The areas were:  (1) Investment Performance [50% weighting], (2) Client Feedback [30% weighting], (3) Book of Business [10% weighting] and, (4) New Business [10% weighting].

65.     Defendants allege that, on an overall scale of ranging from "1" to "6" (1 being the lowest and 6 being the highest), Brigham scored 1.8.  One other Portfolio Manager received the same score.  Upon information and belief, this person was not terminated

11

from employment with U.S. Trust, and instead, received many of Brigham's accounts after his termination. This employee is younger than Brigham.

66.     Neither objective nor subjective factors support Defendants ranking Brigham as one of the two Portfolio Managers with the lowest overall score.

67.     At the time Brigham was terminated, his score for "Investment Performance" (50% weighting) was a "2." Five other Portfolio Managers received the same score. Two received a "1."

68.     For "Client Feedback" (30% weighting), Brigham received the lowest score of all twenty-four Portfolio Managers ranked. He was the only one to receive a score of 1 in this category out of a possible 6.

69.     Brigham believes that no substantive negative "feedback" from clients exists. If it does, in accordance with U.S. Trust's own policies and procedures, it should be recorded in written form as a "complaint" and available in the central Client Complaint file. Upon knowledge and belief, no such complaints exist that would cause Brigham to receive the lowest score in this area, and other Portfolio Managers, who did receive numerous such complaints, received higher scores.

70.     In Brigham's 2003 evaluation, given to him just months before the ranking was conducted, Switzer, Brigham's immediate supervisor wrote: "Bill has a deep understanding of his clients and has, according to those with whom I have spoken, provided a high level of service to them."

71.     Upon information and belief, the only complaints about Brigham's service to his clients were those made by Feeks and possibly others at U.S. Trust to Brigham's

superiors. These comments were seemingly tainted by bias and stereotypes about older employees in the workplace.

72.      Brigham believes that his score for "Book of Business" (10% weighting) does not correspond with the objective evidence of the number and the value of the portfolios he managed. At the time of his termination, Brigham managed over 600 million dollars of client assets. Based on objective data, Brigham managed an above average "Book of Business" (as the term was used at U.S. Trust) rather than below average (according to the score he received in this category), relative to other Portfolio Managers.

73.      In the area of "New Business," Brigham received the same score as three other portfolio managers. Six others ranked lower.

74.      Based on objective and unbiased criteria, Brigham should not have received the lowest score or tied for the lowest score in the March 2004 ranking.

75.      Brigham was older than all but three of the Portfolio Managers in the New York Wealth Management Group against whom he was ranked. The three older managers each had specialized circumstances which made their situation and value to U.S. Trust different from many of the others.

76.      At the time Brigham was terminated, he was handed a single page document titled "Older Worker Benefit Protection Act Disclosure." This was given to Brigham on the premise that more than one employee in his group was being terminated. The ages of the other Portfolio Managers against whom Brigham had been evaluated were listed.

77.      Brigham was the only Portfolio Manager in the New York Wealth Management Group to be terminated.

78.     After Brigham's termination, Glennon (who is almost twenty years younger than Brigham) was assigned many of Plaintiff's client accounts, including all of the Maclellan accounts Brigham had managed.

**D.     Post Termination**

79.     At the time U.S. Trust terminated Brigham, he had no intention of retiring. He looked forward to many more years of productive and challenging work there.

80.     As a result of the non-solicitation agreement with its one-year bar on Brigham's solicitation of clients from U.S. Trust, Plaintiff has been severely handicapped in finding comparable employment after his termination.

81.     Since his termination, Brigham has not received offers of employment.

82.     In addition to suffering a loss of salary and benefits, Brigham has and continues to experience emotional distress, including, but not limited to, anxiety, depression, stress, humiliation, loss of self-esteem, fear about his financial security, and a sense that he was betrayed by his employer of so many years.

83.     Prior to Brigham's last day at work, the head of one major client family called the Chief Executive Officer of U.S. Trust, Alan Weber ("Weber"), to say how pleased she was with Brigham's work and requested that he remain the Portfolio Manager on her accounts. (Brigham had informed her in the interim that he would be leaving the company.) She was quite upset. When she expressed her concern about Brigham's departure, Weber replied: "We thought you would like some 'new blood.'"

14

## V.    CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION
### (AGE DISCRIMINATION UNDER THE ADEA)

84.    Plaintiff repeats and re-alleges each and every allegation contained in
paragraphs 1 through 83.

85.    Defendants intentionally and willfully discriminated against Plaintiff on the basis
of his age, in violation of the ADEA, by insisting on the introduction of younger Portfolio
Managers to Brigham's clients.

86.    Defendants intentionally and willfully discriminated against Plaintiff on the basis
of his age, in violation of ADEA, by relying upon impermissible bias against older
employees in evaluating Brigham's performance.

87.    Defendants intentionally and willfully discriminated against Plaintiff on the basis
of his age, in violation of the ADEA, by relying on a tainted performance evaluation and
other criteria impacted by bias to justify the termination of Plaintiff's employment with
U.S. Trust after more than thirty-one years of loyal and dedicated service.

88.    Defendants knew that their actions constituted unlawful discrimination on the
basis of age and showed willful and/or reckless disregard for Plaintiff's statutorily
protected rights.

89.    As a result of Defendants' illegal employment practices, Plaintiff has suffered
and will continue to suffer irreparable injury, emotional distress and monetary damages
unless and until this Court grants relief.

## B.  SECOND CAUSE OF ACTION
## (AGE DISCRIMINATION UNDER THE CITY HUMAN RIGHTS LAW)

90.    Plaintiff repeats and re-alleges each and every allegation contained in
paragraphs 1 through 89.

91.    Defendants intentionally and willfully discriminated against Plaintiff on the basis
of his age, in violation of the City Human Rights Law, by insisting on the introduction of
younger Portfolio Managers to Brigham's clients.

92.    Defendants intentionally and willfully discriminated against Plaintiff on the basis
of his age, in violation of the City Human Rights Law, by relying upon impermissible bias
against older employees in evaluating Brigham's performance.

93.    Defendants intentionally and willfully discriminated against Plaintiff on the basis
of his age, in violation of the City Human Rights Law, by relying on a tainted
performance evaluation and other criteria impacted by bias to justify the termination of
Plaintiff's employment with U.S. Trust after more than thirty-one years of loyal and
dedicated service.

94.    Defendants knew that their actions constituted unlawful discrimination on the
basis of age and showed willful and/or reckless disregard for Plaintiff's statutorily
protected rights.

95.    As a result of Defendants' illegal employment practices, Plaintiff has suffered
and will continue to suffer irreparable injury, emotional distress and monetary damages
unless and until this Court grants relief.

16

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)    Declaring that the acts, practices and omissions complained of herein are in violation of the ADEA and the City Human Rights Law;

(b)    Enjoining and permanently restraining these violations of the ADEA and the City Human Rights Law;

(c)    Directing Defendants to take such affirmative actions as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's future employment opportunities;

(d)    Directing Defendants to pay Plaintiff actual damages and otherwise make Plaintiff whole for all the earnings that Plaintiff would have received but for Defendants' discriminatory treatment including, but not limited to, lost wages and front pay;

(e)    Directing Defendants to pay Plaintiff compensatory damages including damages for emotional distress, pain and suffering, and humiliation pursuant to the City Human Rights Law;

(f)    Directing Defendants to pay Plaintiff liquidated damages based on Defendants' willful and malicious conduct pursuant to the ADEA;

(g)    Directing Defendants to pay Plaintiff punitive damages for the injuries suffered as a result of Defendants' willful and malicious conduct pursuant to the City Human Rights Law;

(h)     Awarding Plaintiff the costs of this action together with expert witness fees and

        reasonable attorneys' fees; and

(i)     Granting such other and further relief as this Court deems necessary and proper.


Dated:     New York, New York
           June 6, 2005


                              RESPECTFULLY SUBMITTED,

                              OUTTEN & GOLDEN LLP


                    By:     Allegra L. Fishel

                              Allegra L. Fishel (AF 4866)
                              Carmelyn P. Malalis (CM 3350)
                              *Attorneys for Plaintiff*
                              3 Park Avenue, 29th Floor
                              New York, New York 10016-5902
                              Phone: (212) 245-1000
                              Fax: (212) 977-4005
                              e-mail: afishel@outtengolden.com
                              e-mail: cpm@outtengolden.com

18